[No. 36722-0-II. Division Two. September 30, 2008.]

RICKEY CALHOUN, *Appellant*, v. THE STATE OF WASHINGTON ET AL., *Respondents*.

878

*Sam K. Eck*, for appellant.

*Robert M. McKenna, Attorney General*, and *Victor M. Minjares, Assistant*, for respondent.

¶1 PENOYAR, A.C.J. — Rickey Calhoun, a pretrial detainee at the Special Commitment Center (SCC), began working for the SCC maintenance department in 2004. After his supervisor treated him inappropriately, which included

making racially derogatory comments, Calhoun brought a cause of action against the State and various individually-named SCC employees for claims including violations of chapters 49.60 and 74.34 RCW. The trial court granted the State's motion for summary judgment. Calhoun now appeals, arguing that the trial court erred in ruling that chapters 49.60 and 74.34 RCW were not applicable to his claims. We affirm.

## FACTS

¶2 The following facts have been taken from declarations made by Rickey Calhoun and others involved in the present case. Calhoun has been an SCC[1] resident since July 17, 2002. Calhoun is a pretrial detainee under chapter 71.09 RCW and has not been civilly committed to the SCC. The phrase "pre-trial detainee" refers to an individual who, because a judge has determined there is probable cause to believe that he is a sexually violent predator, is in custody awaiting a civil commitment trial. Clerk's Papers (CP) at 166; RCW 71.09.040; WAC 388-880-030, -042(1). The phrase "sexually violent predator" (SVP) refers to "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(16). Calhoun's civil commitment trial has been stayed pending the outcome of his underlying criminal sentence appeal.

¶3 In June 2004, Calhoun began working for the SCC maintenance department under William Hutterman's supervision. On September 15, 2004, Hutterman wrapped a chain around Calhoun's wrist and made a racially derogatory comment to him.[2] On October 1, 2004, Calhoun ap-

---

[1] The SCC is owned and operated by the Department of Social and Health Services.

[2] Calhoun is African American and Hutterman is Caucasian.

proached SCC Custodial Supervisor Bridgett Burgess and asked her whether there were any custodial job openings. Calhoun disclosed that the reason he wanted to transfer to her department was because of the September 15 incident and other negative interactions he had had with Hutterman. Burgess urged Calhoun to file a grievance, but Calhoun refused. Following her conversation with Calhoun, Burgess reported Calhoun's allegations to SCC Grievance Investigator Darold Weeks.

¶4 On October 8, 2004, Burgess informed Vocational Program Manager Tom Stepanek of Calhoun's allegations regarding Hutterman. Stepanek then verbally reported Calhoun's allegations to Associate Superintendent Rick Ramseth. Three days later, Stepanek sent a written account of these allegations to Ramseth. Burgess also provided Ramseth a written statement regarding her conversation with Calhoun. Subsequently, Weeks, Stepanek, and Ramseth each attempted to speak to Calhoun about the incident and urged him to file a grievance. Each time, Calhoun refused to talk about the incident or file a grievance.

¶5 On October 23, 2004, Calhoun sent a letter to SCC Superintendent Dr. Henry Richards, in which he complained about the chain incident and explained that Hutterman's general behavior had created a racially hostile working environment. Additionally, Calhoun admitted that he had rebuffed attempts by Weeks, Stepanek, and Ramseth to discuss his allegations against Hutterman or file a grievance. Calhoun did not raise any complaints regarding Weeks, Stepanek, Dr. Richards, or Burgess in the letter. Finally, Calhoun informed Dr. Richards that Stepanek had arranged for him to be transferred to work in the custodial department.

¶6 Although Ramseth conducted an internal investigation, Dr. Richards requested an investigation by Department of Social and Health Services (DSHS) Human Resources Division, Equal Opportunity Section (HRD), on November 1, 2004. On November 4, 2004, Calhoun was

notified that the HRD had opened an investigation. In May 2005, the HRD issued letters to both Dr. Richards and Calhoun informing them that it had completed its investigation. The HRD advised them that it had substantiated Calhoun's allegations and that remedial steps would be taken. Based on this investigation, Dr. Richards formally disciplined Hutterman for violating SCC Policy 140, Resident Abuse.[3]

¶7 On July 31, 2006, Calhoun filed a complaint against the SCC and numerous individually-named defendants.[4] Calhoun alleged that the SCC was his employer under RCW 49.60.040 and pleaded 11 claims. The ones relevant to this appeal are (1) unfair practices in a place of public accommodation in violation of RCW 49.60.030[5] and .215,[6] (2) unfair practices of an employer in violation of RCW 49.60.030 and .180,[7] and (3) unfair or deceptive acts in trade or commerce in violation of RCW 49.60.210.[8] Calhoun later amended his complaint to include two additional

---

[3] SCC Policy 140 provides:

This policy locally implements DSHS Administrative Policy 8.02, Client Abuse Reporting, to protect, to the extent possible, the health and safety of residents and persons conditionally released to less restrictive community settings as our clients; to ensure that client abuse is reported, investigated, and resolved; and to ensure that procedures are in place to prevent abuse.

CP at 218.

[4] The complaint named Hutterman, Weeks, Ramseth, and Dr. Richards as defendants, as well as other defendants who no longer work at the SCC. The State notes that "Calhoun has not shown any connection of these defendants to the issues he has raised on appeal." Resp't's Br. at 8.

[5] RCW 49.60.030(1)(a) provides the right to be free from discrimination because of race, creed, color, or national origin, among other things. This right includes the right to obtain and hold employment without discrimination. RCW 49.60.030(1)(a).

[6] RCW 49.60.215 provides that it shall be an unfair practice for any person or the person's agent or employee to commit an act that directly or indirectly results in any distinction, restriction, or discrimination, regardless of race, creed, color, or national origin, among other things.

[7] RCW 49.60.180 generally prohibits hiring, discharging, or imposing terms and conditions of employment based on membership in a protected class.

[8] RCW 49.60.210 addresses discrimination against persons opposing unfair practice and retaliation against whistleblowers. Calhoun alleges that "[a]s a result of his complaints, [he] received two job demotions and lost three jobs in less

relevant claims: (1) abuse of a vulnerable adult in violation of RCW 74.34.200 and (2) official misconduct in violation of RCW 74.34.035, .063, and .200.[9] Calhoun also claimed violations of other duties allegedly owed to him under RCW 74.34.180. In addition to attorney fees and costs, Calhoun sought an award of damages for "injuries sustained" on each of his claims. CP at 35-44.

¶8 On June 5, 2007, the State moved for summary judgment, which the trial court heard on July 27, 2007. The trial court granted summary judgment on the following grounds: (1) the statute of limitations barred several of Calhoun's claims,[10] (2) service on the individually-named defendants was deficient,[11] (3) chapter 49.60 RCW did not apply to Calhoun's claims, (4) chapter 74.34 RCW did not apply to Calhoun's claims, (5) Calhoun failed to demonstrate any genuine issue of material fact that the defendants treated him in a tortious manner, and (6) Calhoun failed to produce evidence of damages.

¶9 Calhoun now appeals the trial court's decision granting summary judgment, but he assigns error only to the trial court's rulings that chapters 49.60 and 74.34 RCW do not apply to his claims.

---

than six months." Appellant's Br. at 2. He also claims that "[e]ach new job assignment had fewer hours and more difficult work conditions until finally he was terminated entirely from any job position at [the] SCC." Appellant's Br. at 2. In addition to workplace retaliation, Calhoun contends, he has "endured other forms of retaliation, discrimination, harassment, and abuse arising from his complaints against Mr. Hutterman and [the] SCC. These forms of retaliation included cell searches, disciplinary proceedings, forced relocation and solitary confinement." Appellant's Br. at 2 (citations omitted).

[9] We discuss relevant portions of chapter 74.34 RCW in greater depth below.

[10] The trial court held that incidents that occurred between 2001 and August 1, 2003 were barred under the three-year statute of limitations for personal injury actions, RCW 4.16.080(2).

[11] On June 22, 2007, seven months after the statute of limitations expired under RCW 4.16.170, Calhoun served Hutterman, Dr. Richards, Weeks, Ramseth, and two other individually-named defendants. Calhoun never served the remaining individually-named defendants.

## ANALYSIS

### I. Standard of Review

 ¶10 On review of an order for summary judgment, we perform the same inquiry as the trial court. *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 860, 93 P.3d 108 (2004) (citing *Kruse v. Hemp*, 121 Wn.2d 715, 722, 853 P.2d 1373 (1993)). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). A material fact is one upon which the outcome of the litigation depends. *Wojcik v. Chrysler Corp.*, 50 Wn. App. 849, 853, 751 P.2d 854 (1988). We consider all facts in the light most favorable to the nonmoving party. *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005) (citing *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990)). Summary judgment is appropriate only if reasonable persons could reach but one conclusion from all the evidence. *Vallandigham*, 154 Wn.2d at 26 (citing *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982)).

¶11 The moving party bears the burden of demonstrating that there is no genuine issue of material fact. *Atherton*, 115 Wn.2d at 516. "If the moving party satisfies its burden, the nonmoving party must present evidence that demonstrates that material facts are in dispute." *Atherton*, 115 Wn.2d at 516. If the nonmoving party fails to do so, then the summary judgment is proper. *Vallandigham*, 154 Wn.2d at 26 (citing *Atherton*, 115 Wn.2d at 516). We review all questions of law de novo. *Berger v. Sonneland*, 144 Wn.2d 91, 103, 26 P.3d 257 (2001).

### II. Washington Law Against Discrimination (WLAD)

¶12 In 1949, the legislature enacted WLAD to address employment discrimination. The act prohibited discrimina-

tion in employment on the basis of race, creed, color, or national origin. *Marquis v. City of Spokane*, 130 Wn.2d 97, 105, 922 P.2d 43 (1996). In its motion for summary judgment, the State argued that Calhoun was not an employee for purposes of WLAD, which is currently codified at chapter 49.60 RCW. The trial court agreed and granted summary judgment on the issue. Calhoun argues that he is an employee under chapter 49.60 RCW. Washington courts have not addressed whether an SCC resident-worker is an employee for purposes of chapter 49.60 RCW.

¶13 Statutory interpretation is a question of law we review de novo. *Philippides v. Bernard*, 151 Wn.2d 376, 383, 88 P.3d 939 (2004). Courts must follow the plain meaning of the statute whenever possible. *Kilian v. Atkinson*, 147 Wn.2d 16, 20, 50 P.3d 638 (2002). We look to the statute's plain language in order to fulfill our obligation and give effect to legislative intent. *Lacey Nursing Ctr., Inc. v. Dep't of Revenue*, 128 Wn.2d 40, 53, 905 P.2d 338 (1995). The plain meaning rule includes not only the ordinary meaning of the words but also the underlying legislative purposes and closely related statutes to determine the proper meaning of the statute. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). If a statute is plain and unambiguous, we derive its meaning from the language itself. *Cockle v. Dep't of Labor & Indus.*, 142 Wn.2d 801, 807, 16 P.3d 583 (2001). We disagree with Calhoun and hold that the trial court did not err in ruling that chapter 49.60 RCW does not apply to his claims.

¶14 RCW 49.60.040(4) provides that the term "employee" does not include any individual employed by his or her parents, spouse, or child, or in the domestic service of any person. The term "employer" includes any person acting in the interest of an employer, directly or indirectly, who employs eight or more persons, and does not include any religious or sectarian organization not organized for

private profit.[12] RCW 49.60.040(3). Therefore, the statute itself does not explicitly clarify whether an SCC resident-worker may fall within its scope of protection.

¶15 Calhoun argues that because Washington courts have not examined the relationship between patient-employees and treatment facility operators and because the Washington Minimum Wage Act (MWA)[13] is based on the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219, the FLSA offers persuasive authority in this case.[14] The State responds that neither the FLSA nor the MWA applies to the present case. We agree. We note that, for purposes of the MWA, an "employee" does not include "[a]ny resident, inmate, or patient of a state, county, or municipal correctional, detention, treatment or rehabilitative institution." RCW 49.46.010(5)(k). In light of this exclusion, there is no reason to believe that the legislature or the courts expected or intended that principles derived from the MWA would be used to determine whether an SCC resident-worker qualifies as an "employee" under chapter 49.60 RCW. Furthermore, at oral argument, counsel for Calhoun conceded that as an SCC resident-worker, Calhoun is ineligible for workers' compensation; the State also noted that SCC resident-workers are ineligible for Social Security benefits and cannot participate in the State's employee retirement program.

¶16 Lastly, the record provides insufficient indices of employment in this case. The State concedes some similari-

---

[12] SCC Policy 214, which became effective on September 1, 1998, governs resident jobs and job training at the SCC. The policy defines the term "job" as "a resident vocational training position" and states:

> Resident job, placement, training, supervision and evaluation within the SCC secure facility are a component of the overall training program, which is itself part of the total program of treatment at the [SCC].

CP at 170. Furthermore, the policy states that resident jobs are "privileges" and are part of the SCC's therapeutic program. CP at 171.

[13] The MWA is currently codified at chapter 49.46 RCW.

[14] Calhoun argues that in order to determine whether an employer-employee relationship exists under chapter 49.60 RCW in this case, we should conduct an "economic reality test," which "examines the employment relationship in terms of economic reality, rather than technical terms." Appellant's Br. at 7.

ties to employment: the SCC (1) pays Calhoun "minimal" monetary compensation for his work, (2) does not require Calhoun (or its other residents) to work, and (3) exercises control and direction over Calhoun's treatment program and work performance. That Calhoun's employment is optional, paid, and supervised, however, does not necessarily demonstrate that he is an employee for purposes of this statute. Rather, he is a pretrial detainee attempting to adapt to life at the SCC. It is healthy for SCC residents to remain active and feel productive on a daily basis. For many of these residents, contributing to the community in which they live undoubtedly facilitates the treatment process. The SCC, which recognizes this, has developed a treatment program into which these principles are integrated. Earning a living is the goal of most workers. But the primary goal of work at the SCC is to maintain a healthy lifestyle and promote good habits for the residents. We are not persuaded that Calhoun is an employee for purposes of chapter 49.60 RCW.

¶17 Furthermore, the SCC has adopted several policies that govern resident job training, resident abuse, and the process by which residents can file grievances against SCC personnel. Even though Calhoun repeatedly refused to participate in the SCC's internal grievance process in this case, the SCC ultimately disciplined Hutterman for his discriminatory actions. We hold that Calhoun's claims were adequately addressed by the SCC and that the trial court's ruling that chapter 49.60 RCW does not provide the proper forum in which to address these claims was correct.

III. Abuse of Vulnerable Adults Act

¶18 Calhoun further argues that he is a vulnerable adult under chapter 74.34 RCW and that the SCC and its

employees violated RCW 74.34.200[15] with respect to him. The State responds that chapter 74.34 RCW does not apply to Calhoun as "it was never the Legislature's intent to extend the protection of this Act to sexually violent predators confined for treatment at [the] SCC." Resp't's Br. at 20. Like the previous issue, Washington courts have not addressed the applicability of chapter 74.34 RCW in this context.

¶19 The trial court ruled that chapter 74.34 RCW does not, as a matter of law, apply to the SCC or to Calhoun as an SCC resident. RCW 74.34.200(1) provides:

> In addition to other remedies available under the law, a vulnerable adult who has been subjected to abandonment, abuse, financial exploitation, or neglect either while residing in a facility or in the case of a person residing at home who receives care from a home health, hospice, or home care agency, or an individual provider, shall have a cause of action for damages on account of his or her injuries, pain and suffering, and loss of property sustained thereby.

¶20 Under RCW 74.34.020(15)(d), a "vulnerable adult" includes a person "[a]dmitted to any facility." RCW 74.34-.020(5) defines "facility" as:

> [A] residence licensed or required to be licensed under chapter 18.20 RCW, boarding homes; chapter 18.51 RCW, nursing homes; chapter 70.128 RCW, adult family homes; chapter 72.36 RCW, soldiers' homes; or chapter 71A.20 RCW, residential rehabilitation centers; or any other facility licensed by [DSHS].

¶21 The State notes, and the statute reflects, that the aforementioned list does not expressly implicate the SCC, which is governed by chapter 71.09 RCW. Furthermore, although the SCC is operated by DSHS, it neither is licensed by DSHS nor requires such a license under chapter 71.09 RCW. Therefore, under the plain language of RCW

---

[15] The abuse of vulnerable adults act is currently codified at chapter 74.34 RCW. RCW 74.34.200 establishes a cause of action for the abandonment, abuse, financial exploitation, or neglect of a vulnerable adult.

74.34.020(5), the SCC is not a "facility" and Calhoun cannot bring a cause of action under RCW 74.34.200.[16]

¶22 Although Calhoun argues otherwise, including pretrial detainees and civilly committed SVPs within the definition of "vulnerable adult" would also be inconsistent with the presumed legislative intent behind chapter 74.34 RCW. It is clear that the abuse of vulnerable adults act was intended to protect those who are unable to care for themselves and whose physical or mental disabilities have placed them in a dependent position. *See* RCW 74.34.005 (legislative findings). In light of this objective, this statute often appears in the context of protecting elderly, mentally ill, and disabled persons from abuse, neglect, financial exploitation, and abandonment by family members, care providers, and other persons with whom the vulnerable adult has a relationship. *See Cummings v. Guardianship Servs. of Seattle*, 128 Wn. App. 742, 110 P.3d 796 (2005) (personal representative of elderly woman's estate brought actions against woman's co-guardians, guardians' attorney, and two live-in caregivers, after woman fell from her condominium window and died); *Conrad v. Alderwood Manor*, 119 Wn. App. 275, 78 P.3d 177 (2003) (personal representative of elderly woman's estate sued nursing home for negligence and neglect); *Caulfield v. Kitsap County*, 108 Wn. App. 242, 29 P.3d 738 (2001) (disabled patient brought negligence action against DSHS, county, and personal caregiver for injuries patient sustained from caregiver's neglect).

¶23 Calhoun argues that since chapter 74.34 RCW applies in situations involving abuse in state mental hospitals DSHS operates, it should apply to SCC residents "who by definition have a mental problem which requires them to be segregated from the public." Appellant's Br. at 12-13. Al-

---

[16] Furthermore, chapter 388-881 WAC provides for the independent, external oversight of the SCC by an external governing body. Arguably, DSHS could require itself to obtain a license to operate the SCC. Instead, it has delegated oversight responsibilities to an external governing body. Thus, it does not fall within the definition of "facility" under chapter 74.34 RCW.

though Calhoun's assertion that many SCC residents suffer from various psychological and mental defects is accurate, his argument that the legislature intended for this statute to apply to those residents is simply untenable. Calhoun has failed to demonstrate that SCC residents are vulnerable in the same sense that the elderly, mentally ill, and disabled, for example, are vulnerable. Thus, we affirm the trial court's ruling that chapter 74.34 RCW does not apply to the present case.

## IV. RETALIATION AGAINST WHISTLEBLOWERS

¶24 Additionally, Calhoun argues that he is a whistleblower under chapter 74.34 RCW. The State responds that Calhoun is not a whistleblower under this statute and that the trial court correctly ruled that chapter 74.34 RCW applies to neither the SCC nor its residents. Because chapter 74.34 RCW does not appear to apply in this context, however, we need not address this issue.

## V. OTHER GROUNDS FOR DISMISSAL

¶25 The State argues that because Calhoun has failed to assign error to the other grounds on which the trial court granted summary judgment (i.e., statute of limitations, deficient service, failure to provide evidence of tortious conduct), he has waived any issue pertaining to dismissal of his claims on those grounds. Calhoun does not address these issues in either his opening brief or his reply brief. Thus, we need not review these issues and affirm the trial court's dismissal on these grounds.

¶26 We affirm.

ARMSTRONG and HUNT, JJ., concur.