
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| BROOKE HOWELL, | ) | |
| | ) | No. 35339-7-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF SOCIAL AND | ) | PUBLISHED OPINION |
| HEALTH SERVICES, | ) | |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, J. — Brooke Howell appeals the dismissal with prejudice of her discrimination claim asserted against the Department of Social and Health Services (DSHS). She contends that its rules and policies, including its practice of retaining records of "founded" filings of child neglect by individuals have a disparate impact on the ability of Native Americans like herself to obtain work. We hold that under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, an employee or applicant for employment can state a cause of action against a third party who interferes with the individual's right to obtain and hold employment without discrimination.

A difficulty with the parties' remaining arguments below and on appeal is that the record is not well developed with evidence of the policies of DSHS that are challenged, nor has DSHS presented evidence of high-level policy considerations that might afford it discretionary immunity. The fact that some of the rule- and policy-making authority of DSHS on which Ms. Howell appears to rely was delegated to the Department of Children, Youth, and Families in agency reorganizations effective after her complaint was filed exacerbates the lack of clarity. Ms. Howell may need to amend her complaint.

On the present record, DSHS's arguments for dismissal fail. We reverse the trial court's order that dismissed Ms. Howell's complaint with prejudice and remand for further proceedings.

PROCEDURAL BACKGROUND

After Brooke Howell sued DSHS for alleged discrimination in violation of the WLAD, it filed a CR 12(c) motion for judgment on the pleadings, which the trial court granted. Our review requires us to assume the truth of facts alleged in Ms. Howell's complaint as well as hypothetical facts. We summarize the allegations of her complaint and her argument.

*DSHS's complained-of conduct*

Ms. Howell bases DSHS's asserted liability on the manner in which it has exercised its discretion to impose background check requirements, and retain and make

available findings from adjudicative hearings that can disqualify persons like her from employment.

She makes the following allegations:

Under RCW 43.43.832 et seq., many Washington employers are required to obtain a background check when hiring or retaining an individual in a position potentially involving unsupervised access to children or vulnerable adults.

Pursuant to authority delegated in chapter 26.44 RCW, it is DSHS that investigates and makes administrative findings against persons alleged to have committed child abuse or neglect.

DSHS is required by statute to "keep records concerning founded reports of child abuse or neglect as the department determines by rule." RCW 26.44.031(3). If a finding becomes final either after an administrative hearing or by default (because an accused person fails to appeal a notice of the finding), the accused's name is placed in a database of persons with administrative findings of abuse, neglect or other employment-disqualifying conduct.

By rule, DSHS keeps "founded" findings of abuse or neglect as required by DSHS records retention policies. WAC 388-15-077.[1] Under DSHS's records retention policies,

_____

[1] Legislation establishing the Department of Children, Youth, and Families (DCYF), effective July 1, 2018, transferred the responsibility for responding to reports of child abuse or neglect under chapter 26.44 RCW to DCYF. *See, e.g.*, LAWS OF 2017, 65th Leg., 3d Spec. Sess., ch. 6, §§ 321-27. The retention schedule for "founded"

No. 35339-7-III
*Howell v. Dep't of Soc. & Health Servs.*

a final finding of abuse or neglect is nearly permanent and may not be expunged or

removed from the Child Protective Services' database for at least 35 years from the date

of the finding.

A founded finding of child abuse or neglect is an automatic disqualification for

certain types of health care employment, including types of health care employment that

one might obtain with a nursing assistant degree.

The administrative hearing process granted under RCW 26.44.125 to a person who

asks for review of a finding of child neglect by DSHS does not consider how the person's

actions are related to her suitability for affected employment. The appeal does not

consider how long the disqualification is appropriate, mitigating factors justifying

removing the finding, or whether the severity of the accusation or alleged conduct

warrants a permanent sanction on the many foreclosed employment opportunities.

For persons with criminal convictions, some, but not others, may demonstrate their

character, competence, and suitability to work with minors or vulnerable adults. Persons

with founded findings of abuse and neglect are never allowed to demonstrate their

character, competence and suitability, however.

findings now appears in the retention schedule for DCYF. *See* DEP'T OF CHILDREN, YOUTH, & FAMILIES, RECORDS RETENTION SCHEDULE: VERSION 1.0, at 11 (July 2018), https://www.sos.wa.gov/_assets/archives/recordsmanagement/department-of-children -youth-and-families-records-retention-schedule-v.1.0-(july-2018).pdf [https://perma.cc /M2UV-46XG].

Ms. Howell alleges that DSHS has options to expunge records without jeopardizing its policy goal of protecting vulnerable people.

*Application to Ms. Howell*

Ms. Howell identifies her race as Native American and is an enrolled member of the Yakama Indian Nation. In 2015, she entered a Nursing Assistant Certified (NAC) training program, desiring to become certified and work in the health care field. In the middle of her school year and before beginning clinical rotations, she learned that DSHS had made a "founded" finding of child neglect against her several years earlier. Clearing a background check with DSHS is a mandatory part of completing the NAC program. Ms. Howell was not allowed to complete the NAC program.

The finding against Ms. Howell followed her arrest in November 2012 for driving under the influence of alcohol (DUI). Ms. Howell's three children were in the car with her. She was charged with DUI and reckless endangerment and addressed the charges by entering a diversion program.

Unknown to Ms. Howell at the time, DSHS made an administrative finding of child neglect against her for the incident leading to her arrest for DUI. It sent notice by certified mail to Ms. Howell but the notice went unclaimed and was returned to DSHS.

Upon learning of the finding and that it would prevent her from completing NAC training and becoming licensed, Ms. Howell appealed the founded finding in June 2015.

An administrative law judge reversed the finding, but DSHS's Board of Appeals reinstated the finding.

In January 2017, Ms. Howell asked DSHS to expunge her founded finding because of the effect of the finding on her ability to work. She asserts that she has complied with all of the conditions of her diversion, no longer drinks alcohol, and has no record of a criminal conviction as a result of the 2012 incident. DSHS did not respond to her request.

*Disparate impact claim*

Ms. Howell's complaint alleges on information and belief that Native Americans are approximately four times more likely than white persons to have founded findings of child abuse or neglect discovered through background checks of DSHS records. She alleges that DSHS's policy of retaining the founded findings for so long, without review or an opportunity for expungement, disparately impacts the ability of Native Americans to obtain work, education, training, and licensure in a field of their choosing.

Ms. Howell alleges that DSHS has no legitimate reason for indefinitely maintaining and reporting the findings. She alleges that even if DSHS has a legitimate reason for indefinitely maintaining its findings, a less discriminatory alternative to its current practice exists: DSHS "could . . . permit accused persons to expunge their findings after demonstrating their rehabilitation; reduce the period of retention of the

record on a background check when there is no evidence of future harm to children; or periodically review all records to determine ongoing need to retain any given record in its background check database." Clerk's Papers (CP) at 9.

*The motion to dismiss*

After answering and amending its answer to the complaint, DSHS moved under CR 12(c) for an order dismissing the complaint. It argued, first, that its conduct is not subject to the WLAD for two reasons: because it is not the employer, and the WLAD imposes liability for employment discrimination only on a plaintiff-employee's employer; and because the prohibition on Ms. Howell's being employed as an NAC is the direct result of an initiative of the people that bars the employment as long-term care workers of individuals with "founded" findings. Alternatively, it argued that its actions are entitled to discretionary immunity.

Ms. Howell did not allege in her complaint that DSHS was an employer. She responded to DSHS's motion to dismiss by arguing that her complaint's allegations that DSHS's practices "exert[ ] direct control over the list of prospective candidates available to . . . employers" and "foreclosed [her] chosen career path," "raise a factual issue significant enough that it should not be dismissed at this early stage." CP at 44.

In responding to the motion, Ms. Howell conceded that the November 2011 Initiative Measure No. 1163, codified at RCW 74.39A.056, raises a statutory bar to

7

employment as a "long-term care worker" for individuals found to have committed child neglect. But she argued that she is not challenging that law; she is challenging DSHS's dissemination of its findings without a method to avoid racial disparity. Alternatively, she argues that other types of employment would remain available to NACs but for DSHS's practice.

The trial court granted DSHS's motion and dismissed the complaint. Ms. Howell appeals.

## ANALYSIS

I.    MS. HOWELL'S COMPLAINT PLEADS A PRIMA FACIE CASE OF DISPARATE IMPACT

Ms. Howell first argues that her complaint pleads a prima facie case of disparate impact; hence, the trial court erred in dismissing it. "[T]he WLAD creates a cause of action for disparate impact." *Kumar v. Gate Gourmet Inc.*, 180 Wn.2d 481, 503, 325 P.3d 193 (2014). The theory of liability prevents employers from adopting facially neutral policies that create or perpetuate discriminatory effects. *Id.* "To establish a prima facie case of disparate impact, the plaintiff must show that (1) a facially neutral employment practice (2) falls more harshly on a protected class." *Id.* If a plaintiff establishes disparate impact under the WLAD, the burden of production shifts to the defendant to produce evidence of a business necessity for the challenged practice. *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 356, 172 P.3d 688 (2007). The

elements and evaluation of a disparate impact claim under the WLAD are the same as

those under federal law. *Id.* at 353-54 & n.7.[2]

Requiring criminal background checks has been held to be an employment

practice that can have a disparate impact on a protected class. By way of illustration, in

enforcement guidance provided in 2012 for entities covered by Title VII, the Equal

Employment Opportunity Commission (EEOC)—"build[ing] on longstanding court

decisions and existing guidance documents that [it] issued over twenty years ago"—

described the type of statistical information that will demonstrate that a protected class

has more contact with the criminal justice system and a higher incarceration rate. EEOC

Enforcement Guidance No. 915.002 (Guidance on the Consideration of Arrest and

Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of

1964).[3] It explained:

> With respect to criminal records, there is Title VII disparate impact liability
> where the evidence shows that a covered employer's criminal record
> screening policy or practice disproportionately screens out a Title VII-
> protected group and the employer does not demonstrate that the policy or

---

[2] The dissent argues that Washington "case law is clear that a showing of discriminatory purpose or intent is required; disparate impact is insufficient." Dissent at 4. The three decisions on which it relies all involved equal protection claims, however, not claims under the WLAD. Ms. Howell does not assert an equal protection claim. If and when she does, a showing of discriminatory purpose or intent will be required. *See, e.g.*, *State v. Coria*, 120 Wn.2d 156, 174-75, 839 P.2d 890 (1992).

[3] EEOC Enforcement Guidance No. 915.002, (Apr. 25, 2012), https://www.eeoc .gov/laws/guidance/upload/arrest_conviction.pdf [https://perma.cc /R5S2-VVWJ].

practice is job related for the positions in question and consistent with business necessity.

*Id.* § V.

The EEOC guidance publication cites leading cases that identify how the employer can demonstrate a business necessity for its criminal background check practice if disparate impact is shown. In the 1975 Eighth Circuit Court of Appeals decision in *Green v. Missouri Pacific Railroad Co.*, 523 F.2d 1290, 1293, the court identified three aspects of the information sought (later termed the "*Green* factors") relevant in assessing whether a criminal background exclusion is job related for a position and consistent with business necessity:

- The nature and gravity of the offense or conduct;
- The time that has passed since the offense or conduct and/or completion of the sentence; and
- The nature of the job held or sought.

EEOC Enforcement Guidance, *supra*, § V(B)(1) (footnotes omitted). In *El v. Southeastern Pennsylvania Transportation Authority*, 479 F.3d 232, 244-45 (3d Cir. 2007), the Third Circuit Court of Appeals "develop[ed] the statutory analysis in greater depth," according to the EEOC guidance publication, when it held that Title VII requires employers to justify criminal record exclusions by demonstrating that the exclusions "'accurately distinguish between applicants [who] pose an unacceptable level of risk and

those [who] do not.'" EEOC Enforcement Guidance, *supra*, § V(B)(1) (quoting *El*, 479 F.3d at 245).

DSHS does not dispute that an employer's criminal background checks might support a disparate impact claim. It contends that Ms. Howell did not plead the required "employment practice" because she did not plead facts that would establish that DSHS was her employer.

A. Standard for dismissal and standard of review

A party can move the trial court for judgment on the pleadings under CR 12(c). A motion under CR 12(c) raises the same issue as a motion to dismiss under CR 12(b)(6): whether a complaint states a claim for which a court can grant relief. *Didlake v. State*, 186 Wn. App. 417, 422, 345 P.3d 43 (2015). One practical difference between motions under CR 12(b)(6) and 12(c) is timing, since a CR 12(b)(6) motion is made after the complaint but before the answer, while a CR 12(c) motion is made after the pleadings are closed. *P.E. Sys., LLC v. CPI Corp.*, 176 Wn.2d 198, 203, 289 P.3d 638 (2012). A CR 12(c) motion is proper when a defendant relies for the motion on an affirmative defense, since an affirmative defense is external to the complaint. *E.g.*, *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 & n.1 (7th Cir. 2012). "A court may dismiss a complaint under CR 12 only if 'it appears beyond doubt that the plaintiff cannot prove

11

any set of facts which would justify recovery.'" *Didlake*, 186 Wn. App. at 422 (quoting

*Tenore v. AT&T Wireless Servs.*, 136 Wn.2d 322, 330, 962 P.2d 104 (1998)).

When ruling on a motion under CR 12(c), we "must assume the truth of facts

alleged in the complaint, as well as hypothetical facts, viewing both in the light most

favorable to the nonmoving party." *Didlake*, 186 Wn. App. at 422. We do not accept

legal conclusions as correct, even when couched as facts in the complaint. *Papasan v.

Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986). We review a trial

court's decision under CR 12(c) de novo. *Didlake*, 186 Wn. App. at 422.

 B. For DSHS to be liable under the WLAD, it need not be Ms. Howell's actual or
   prospective employer

   1. The general civil right declared by RCW 49.60.030(1) contains no language
    limiting "[t]he right to obtain and hold employment without discrimination"
    to a right vis-à-vis an actual or prospective employer

The right to seek the remedies sought in Ms. Howell's complaint is provided by

RCW 49.60.030(2), which provides that "[a]ny person deeming himself or herself injured

by any act in violation of this chapter shall have a civil action in a court of competent

jurisdiction to enjoin further violations, or to recover the actual damages sustained by the

person, or both," together with certain costs and remedies authorized by other state and

federal laws. In *Marquis v. City of Spokane*, 130 Wn.2d 97, 112-13, 922 P.2d 43 (1996),

our Supreme Court agreed with the Washington Human Rights Commission's

interpretation of the WLAD as having two provisions that create rights to be free from

12

invidious discrimination in the workplace, one of which makes no reference to the plaintiff being an employee or the defendant being an employer. This was critical because the plaintiff in *Marquis* was an independent contractor, not an employee.

The commission had adopted a regulation, former WAC 162-16-170(2) (1995) (presently codified at WAC 162-16-230(2)), which interprets RCW 49.60.030(2) as authorizing private civil actions to remedy not only the "unfair practices of employers" that are identified by RCW 49.60.180, but also violations of RCW 49.60.030(1)'s declaration of a general civil right to be free from discrimination in obtaining and holding employment.[4] *Marquis*, 130 Wn.2d at 112-13.

The "unfair practices" provision of the WLAD, RCW 49.60.180, uses the words "employer" and "employee," and the commission's regulation states that "[a] person who works or seeks work as an independent contractor, rather than as an employee, is not entitled to [its] protection." Former WAC 162-16-230(2) (2001). But the commission's rule provides that an independent contractor is protected by the general right declared by RCW 49.60.030, a protection that does not use the words "employer" or "employee," and

_____

[4] RCW 49.60.030(1) provides, in relevant part:

The right to be free from discrimination because of race, creed, color, national origin, sex, honorably discharged veteran or military status, sexual orientation, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability is recognized as and declared to be a civil right. This right shall include, but not be limited to:

    (a) The right to obtain and hold employment without discrimination

that the commission states is "enforceable by private lawsuit in court under RCW

49.60.030(2) but not by actions of the [commission]." Former WAC 162.16.230(2).

In *Marquis*, the Supreme Court agreed that the plain language of RCW

49.60.030(1) supports the commission's conclusion that it creates a general civil right

that can be privately enforced, describing it as "broadly stated, . . . to be liberally

construed, and . . . meant to prevent and eliminate discrimination in the State of

Washington." 130 Wn.2d at 112. Based on the WLAD's plain language and *Marquis*,

Ms. Howell did not have to plead facts establishing that DSHS was her employer in order

to assert a claim under RCW 49.60.030(1).[5]

> 2. We need not decide whether RCW 49.60.180 supports an "interference" or "indirect employment" theory of liability against a covered employer who is not a plaintiff's actual or prospective employer

Relying on federal case law construing Title VII, Ms. Howell argues that we

should construe RCW 49.60.180, the "unfair practices" provision of the WLAD that is

limited by its terms to practices by employers, as applying even where a covered

---

[5] The dissent baldly asserts that in *Marquis*, had the city of Spokane "not been an employer, it could not have discriminated against the plaintiff's 'right to obtain and hold *employment* without discrimination.'" Dissent at 2-3.

We can take judicial notice that DSHS employs people; we regularly review appeals involving the work of its employees. As discussed in the next section, a number of Title VII decisions have held that a covered employer can be the proximate cause of a plaintiff's inability to obtain or hold employment without being the plaintiff's own employer. Even those federal decisions that disagree, recognize that whether direct employment is required presents a legitimate question—they do not reject the possibility of third party employer liability out of hand, as does the dissent here.

employer interferes with the employment opportunities of an employee who is not its employee or prospective employee.

Title VII includes a definition of "employer," but it does not illuminate the word's ordinary meaning. Instead, it identifies *which* employers (applying a common law meaning[6]) are subject to the law's requirements—in other words, which employers are covered by the federal act. The statutory definition imposes employee-numerosity and commerce-connection requirements and exempts certain employers from liability.

Federal courts have required that to state a cause of action, a plaintiff must be *someone's* employee or applicant. *E.g.*, *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 (2d Cir. 2008) ("Once a plaintiff is found to be an independent contractor and not an employee . . . the Title VII claim must fail."). They have required that the defendant be a covered employer. *E.g.*, *Lutcher v. Musicians Union Local 47*, 633 F.2d 880, 883 n.3 (9th Cir. 1980) (liability might attach "where *a defendant subject to Title VII* interferes with an individual's employment opportunities with another employer" (emphasis added)). For the most part, they have not required that the defendant be the plaintiff's direct employer. Many federal courts have recognized claims where a covered

---

[6] For purposes of Title VII and other federal acts that use the term "employee" without defining it, the Supreme Court has held that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739-40, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989).

employer interferes with the employment opportunities of someone else's employee.[7]

The EEOC's compliance manual also continues to support an interference theory. It

characterizes itself as following Supreme Court decisions requiring a common law

agency analysis in determining employment status, stating that a Title VII plaintiff must

establish both that she or he is someone's common law employee, and that the defendant

is a covered common law employer of other employees. *See* EEOC COMPLIANCE

MANUAL § 2-III(B)(3)(a)(i)[8], and EEOC Enforcement Guidance No. 915 (eff. May 20,

1987) (control by third parties over the employment relationship between an individual

and her or his direct employer).[9]

---

[7] *See, e.g.*, *Sibley Mem'l Hosp. v. Wilson*, 160 U.S. App. D.C. 14, 488 F.2d 1338 (1973); *Zaklama v. Mt. Sinai Med. Ctr.*, 842 F.2d 291, 294 (11th Cir. 1988); *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 875 (6th Cir. 1991). *But see Shah v. Deaconess Hosp.*, 355 F.3d 496, 500 (6th Cir. 2004) (questioning, but not limiting or overruling *Christopher*); *Ass'n of Mexican-Am. Educators v. California*, 231 F.3d 572, 581 (9th Cir. 2000) (en banc); *Graves v. Lowery*, 117 F.3d 723, 728 (3d Cir. 1997) (in a case turning primarily on a joint employer rationale, characterizing "employer" status as "look[ing] to the level of control an organization asserts over an individual's access to employment and the organization's power to deny such access") (citing *Sibley*, 488 F.2d at 1342)); *but cf.*, *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 370-76 (2d Cir. 2006) (quoting *Reid*, 490 U.S. at 739-40); *Lopez v. Massachusetts*, 588 F.3d 69, 89 (1st Cir. 2009) ("The interference theory has no basis in our circuit law, has never been adopted by this circuit, and contradicts Supreme Court case law.").

[8] EEOC COMPLIANCE MANUAL § 2-III(B)(3)(a) (Aug. 6, 2009), https://www.eeoc .gov /policy/docs/threshold.html#2-III-B-3-a [https://perma.cc/B6GT-LZEC].

[9] EEOC Enforcement Guidance No. 915, https://www.eeoc.gov/policy/docs /control_by_third_parties.html [https:// perma.cc/3SW8-XTMG].

In light of Ms. Howell's ability to pursue her claim under RCW 49.60.030, we see no need to decide whether RCW 49.60.180 would provide an alternative basis for her claim.

II.    DSHS HAS NOT DEMONSTRATED THAT PROVISIONS OF INITIATIVE 1163, CODIFIED AT RCW 74.39A.056, ARE FATAL TO MS. HOWELL'S CLAIM

In November 2011, Washington voters approved Initiative 1163, the "Restoring Quality Home Care Initiative."  LAWS OF 2012, ch. 1, § 308.  The intent of the initiative was to reinstate a requirement that long-term care workers obtain criminal background checks, which the state legislature had proposed to eliminate.  LAWS OF 2012, ch. 1, § 1.  DSHS argues, and Ms. Howell concedes, that Washington law established by the initiative is just as binding as the WLAD, is more recent, and must be harmonized with the WLAD.[10]

DSHS argues that the approval and enactment of the initiative is the true impediment to Ms. Howell's employment prospects.  It points to the following provision of the initiative, codified at RCW 74.39A.056(2):

> No provider, or its staff, or long-term care worker, or prospective provider or long-term care worker, with a stipulated finding of fact, conclusion of law, an agreed order, or finding of fact, conclusion of law, or final order issued by a disciplining authority or a court of law or entered into a state registry with a final substantiated finding of abuse, neglect, exploitation, or abandonment of a minor or a vulnerable adult as defined in chapter 74.34

---

[10] Contrary to the suggestion by the dissent, no one contends, nor do we suggest, that the WLAD trumps other statutes.

RCW shall be employed in the care of and have unsupervised access to vulnerable adults.

Ms. Howell makes two arguments in response: first, that DSHS has been given rulemaking discretion as to how the employment prohibition is applied and second, that it is other DSHS action, not the initiative, which completely precludes Ms. Howell from becoming certified and employed as an NAC.

A.      DSHS's rulemaking discretion

Subsections of RCW 74.39A.056 delegate authority to DSHS to adopt rules to implement the provision and to establish the state registry against which the background checks will be conducted. RCW 74.39A.056(4) provides that "[t]he department shall adopt rules to implement this section." RCW 74.39A.056(3) authorizes DSHS to establish the state registry by rule, adding that the rule "must include disclosure, disposition of findings, notification, findings of fact, appeal rights, and fair hearing requirements."

Administrative rules and regulations adopted by an agency pursuant to statutory authority are valid if they are reasonably consistent with the statute being implemented, and the intent and purpose of the legislation. *Multicare Med. Ctr. v. Dep't of Soc. & Health Servs.*, 114 Wn.2d 572, 588, 790 P.2d 124 (1990). Washington's Administrative Procedure Act provides that an agency may use a statute's statement of intent or purpose in interpreting its other provisions. RCW 34.05.322. Section 1 of Initiative 1163 stated

18

that it was the intent of the people through the initiative "to protect vulnerable elderly and people with disabilities by reinstating the requirement that all long-term care workers obtain criminal background checks and adequate training." LAWS OF 2012, ch. 1, § 1.

DSHS has so far not demonstrated that its rulemaking authority is too limited for it to develop a registry and fashion background check requirements that would have the features Ms. Howell alleges are possible: "permit[ting] accused persons to expunge their findings after demonstrating their rehabilitation; reduce the period of retention of the record on a background check when there is no evidence of future harm to children; or periodically review all records to determine ongoing need to retain any given record in its background check database." CP at 9.[11]

B.     RCW 74.39A.056 does not present a complete bar to Ms. Howell's employment as an NAC

Alternatively, Ms. Howell argues that even if construed as argued by DSHS, RCW 74.39A.056(2) does not foreclose her from all employment as an NAC. A "nursing assistant" is "an individual, regardless of title, who, under the direction and supervision of a registered nurse or licensed practical nurse, assists in the delivery of nursing and

---

[11] The Washington Supreme Court recently held that agency regulations that do not provide safeguards against the high risk of erroneous deprivation of an individual's protected interest in pursuing her chosen, lawful occupation may subject the agency to as-applied due process claims. *Fields v. Dep't of Early Learning*, No. 95024-5, slip op. at 18-19 & n.6 (Wash. Feb. 21, 2019) (plurality opinion) (procedural due process) https://www.courts.wa.gov/opinions/pdf/950245.pdf; *id.* at 5-6 (McCloud, J., concurring) (substantive due process).

nursing-related activities to patients in a health care facility." RCW 18.88A.020(8). A

"nursing assistant-certified" is a nursing assistant certified under chapter 18.88A RCW.

To receive a nursing assistant certificate, an applicant must successfully complete an

approved training program or satisfy alternative training criteria adopted by the

Washington Nursing Care Quality Assurance Commission and successfully complete a

competency evaluation. RCW 18.88A.085.

As construed by DSHS, RCW 74.39A.056 would preclude Ms. Howell from being

employed as a "long-term care worker" or serving as a provider or provider staff caring

for, and with unsupervised access to, vulnerable adults. As defined by RCW

74.39A.009(20), "long-term care worker" includes some, but not all, NAC employment:

> (a) "Long-term care workers" include all persons who provide paid, hands-on personal care services for the elderly or persons with disabilities, including but not limited to individual providers of home care services, direct care workers employed by home care agencies or a consumer directed employer, providers of home care services to persons with developmental disabilities under Title 71A RCW, all direct care workers in state-licensed assisted living facilities, enhanced services facilities, and adult family homes, respite care providers, direct care workers employed by community residential service businesses, and any other direct care worker providing home or community-based services to the elderly or persons with functional disabilities or developmental disabilities.
> (b) "Long-term care workers" do not include: (i) Persons employed by the following facilities or agencies: Nursing homes licensed under chapter 18.51 RCW, hospitals or other acute care settings, residential habilitation centers under chapter 71A.20 RCW, facilities certified under 42 C.F.R., Part 483, hospice agencies subject to chapter 70.127 RCW, adult day care centers, and adult day health care centers; or (ii) persons who are not paid by the state or by a private agency or facility licensed or certified by the state to provide personal care services.

Not all NAC employment would require Ms. Howell to provide care, with unsupervised access, to vulnerable adults.

DSHS has so far not demonstrated that the provisions approved by Initiative 1163 present a complete bar to Ms. Howell's employment as an NAC.

III.   DSHS HAS NOT YET MADE A SHOWING OF BUSINESS NECESSITY NOR HAS IT DEMONSTRATED THAT DISCRETIONARY IMMUNITY IS FATAL TO MS. HOWELL'S CLAIM

In moving for a dismissal under CR 12(c), DSHS did not undertake to produce evidence of business necessity, a response to Ms. Howell's claim that remains available to it. It did argue, and argues on appeal, that discretionary immunity bars Ms. Howell's claim.

After the Washington legislature abolished the principle of sovereign immunity by passing RCW 4.96.010, the Washington Supreme Court, in *Evangelical United Brethren Church of Adna v. State*, 67 Wn.2d 246, 407 P.2d 440 (1965), created an exception "under which the government could still govern." *Mason v. Bitton*, 85 Wn.2d 321, 327, 534 P.2d 1360 (1975). The purpose of the limited, court-created rule of discretionary immunity is to prevent courts from passing judgment on basic policy decisions that have been committed to coordinate branches of government. *Bender v. City of Seattle*, 99 Wn.2d 582, 588, 664 P.2d 492 (1983). "Since the concept of discretionary governmental immunity is a court-created exception to the general rule of governmental tort liability, its

21

applicability is necessarily limited only to those high level discretionary acts exercised at a truly executive level." *Id.*

In *Evangelical*, the court posed four preliminary questions intended to help distinguish the discretion exercised at a truly executive level to which immunity was granted, from discretion exercised at an operational level, which, if done in a negligent fashion, would subject the government to liability. *Mason*, 85 Wn.2d at 328.[12]

More important for present purposes is an additional requirement for discretionary immunity imposed by the Supreme Court in *King v. City of Seattle*, 84 Wn.2d 239, 246, 525 P.2d 228 (1974). There, the court emphasized that

> to be entitled to immunity the state must make a showing that such a policy decision, consciously balancing risks and advantages, took place. The fact

---

[12] The preliminary questions are:

(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Evangelical*, 67 Wn.2d at 255. If all of the preliminary questions can be clearly and unequivocally answered in the affirmative, then the challenged act, omission, or decision can, with a reasonable degree of assurance, be classified as a discretionary governmental process and nontortious, regardless of its unwisdom. *Id.* If not, further inquiry may become necessary. *Id.*

that an employee normally engages in "discretionary activity" is irrelevant if, in a given case, the employee did not render a considered decision.

*Id.* As observed in *Haslund v. City of Seattle*, 86 Wn.2d 607, 619, 547 P.2d 1221 (1976) (citing *Mason*, 85 Wn.2d at 328), with this further limitation, "discretionary governmental immunity is, in this state, an extremely limited exception."

In moving for dismissal on the basis of discretionary immunity, DSHS asserted that its challenged rules and policies were the result of the exercise of truly high-level executive discretion, not operational level discretion. It appears that at least some of the rules and policies probably were adopted by high-level agency executives. But DSHS did not present the required evidence of the risks and advantages that were consciously balanced (or when, or by whom) before high-level agency executives adopted the rules or policies. Just as an agency rule can be declared invalid if, e.g., it was adopted without compliance with statutory rule-making procedures or is arbitrary and capricious, *see* RCW 34.05.570(2)(c), agency decisions will not enjoy discretionary immunity if the required conscious balancing of risks and advantages did not take place.

IV. CONCLUSION

We hold that DSHS need not be Ms. Howell's employer to be subject to a claim under the WLAD. With that clarification, Ms. Howell can turn her attention to identifying the specific policies and practices about which she complains, an identification she argued below would in some instances require discovery. Report of

Proceedings at 10.[13] DSHS can provide more focused argument as to why it lacks the discretion Ms. Howell contends it enjoys, and any evidence of business necessity or of consideration of risks and advantages that would afford it discretionary immunity.

We reverse the court's order dismissing the complaint and remand for further proceedings.[14]

_____
Siddoway, J.

---

[13] As the EEOC has observed, "The first step in disparate impact analysis is to identify the particular policy or practice that causes the unlawful disparate impact." EEOC Enforcement Guidance No. 915.002, *supra*, § V(A)(1).

[14] Ms. Howell requests an award of reasonable attorney fees pursuant to RAP 18.1 and RCW 49.60.030. Her request is premature because she had not yet prevailed on her disparate impact claim. *Antonius v. King County*, 153 Wn.2d 256, 273, 103 P.3d 729 (2004).

No. 35339-7-III

LAWRENCE-BERREY, C.J. (concurring) — I concur with the lead opinion, but write separately to emphasize my view of why RCW 49.60.030 applies beyond the employer-employee relationship.

RCW 49.60.030(1) states in pertinent part: "The right to be free from discrimination because of race, . . . color, [or] national origin . . . is recognized as and declared to be a civil right. This right shall include, but not be limited to [examples (a) through (g)] . . . ." The first example of a civil right violation is that of a protected person being denied "[t]he right to obtain and hold employment without discrimination." RCW 49.60.030(1)(a). That is the right that DSHS has purportedly violated.

Subsection (a) can be construed narrowly to include only an employer's denial of an employee's right to obtain and hold employment without discrimination. If so, its scope would be identical to RCW 49.60.180, and it would be superfluous. We construe statutes to avoid superfluity whenever possible. *State v. Arlene's Flowers, Inc.*, 187 Wn.2d 804, 826, 389 P.3d 543 (2017), *cert. granted*, 138 S. Ct. 2671, 201 L. Ed. 2d 1067 (2018). It, therefore, is appropriate to reject a narrow construction.

Alternatively, subsection (a) can be construed broadly to apply beyond the employer-employee relationship. This construction is reasonable especially if the other subsections of RCW 49.60.030(1) apply beyond the employer-employee relationship. *See In re Arbitration of Mooberry*, 108 Wn. App. 654, 658, 32 P.3d 302 (2001)

(Subsections passed simultaneously "are in pari materia, and should be construed together in determining their meaning."). Here, subsections (b), (c), (d), (e), (f), and (g) each apply beyond the employer-employee relationship. *See* RCW 49.60.030(1)(b) (the right to full enjoyment of public accommodations); RCW 49.60.030(1)(c) (the right to engage in real estate transactions); RCW 49.60.030(1)(d) (the right to engage in credit transactions); RCW 49.60.030(1)(e) (the right to engage in insurance transactions); RCW 49.60.030(1)(f) (the right to engage in commerce free from discriminatory boycotts or blacklists); and RCW 49.60.030(1)(g) (the right of a mother to publicly breastfeed her child). It is therefore appropriate to construe RCW 49.60.030(1)(a) broadly, as applying beyond the employer-employee relationship.

Lawrence-Berrey, C.J.

No. 35339-7-III

KORSMO, J. (dissenting) — Despite the long history of the Washington Law
Against Discrimination (WLAD), ch. 49.60 RCW, appellant has not been able to point to
any prior instance in which WLAD was used against a nonemployer or to invalidate a
regulation implementing a different statutory protection scheme. The consequences of
this novel determination are quite significant. Seeing no evidence that WLAD
employment protections were intended to apply to nonemployers or that it was designed
as some type of super oversight statute, I respectfully dissent.

Initially, it is prudent to begin with a history lesson. Seventy years ago,
Washington outlawed discrimination in employment, declaring:

> The opportunity to obtain employment without discrimination because of
> race, creed, color or national origin is hereby recognized as and declared to
> be a civil right.

LAWS OF 1949, ch. 183, § 2. That same language today can be found in RCW 49.60.030(1):

> (1) The right to be free from discrimination . . . is recognized as and
> declared to be a civil right. This right shall include . . .
>
> (a) The right to obtain and hold employment without discrimination.

Although WLAD had its start as an anti-discrimination in employment statute, the chapter has broadened over time by legislative expansion of the categories of protected statuses and legislative recognition of new civil rights.

When originally adopted, WLAD provided only for protection against unfair employment practices by employers, labor organizations, or employment agencies. LAWS OF 1949, ch. 183, § 7. The employer section of this provision was codified at RCW 49.60.180, while labor organizations were placed in § 190 and employment agencies in § 200. As new civil rights were added, RCW 49.60.030 was recast into a list of civil rights recognized by the chapter. LAWS OF 1957, ch. 37, § 3. Similarly, the expanded list of protected statuses was added to the unfair employment practices statute, RCW 49.60.180-.200.

The list of civil rights in .030 was found to be an independent basis for bringing an employment-based discrimination claim in *Marquis v. City of Spokane*, 130 Wn.2d 97, 922 P.2d 43 (1996). The plaintiff, an independent contractor, could not sue under .180 because she was not an "employee" eligible to litigate under that statute. *Id.* at 110-11. However, .030 did provide for the right to be free from discrimination based on sex "in the making or performing of a contract for personal services." *Id.* at 112-13.

What is key in *Marquis* is that the plaintiff's claim was brought against the city of Spokane in its *role as an employer*. If Spokane had not been an employer, it could not

have discriminated against the plaintiff's "right to obtain and hold *employment* without discrimination." RCW 49.60.030(1)(a) (emphasis supplied).[1]

Here, DSHS is not an employer for Ms. Howell, or even a prospective employer. Instead, her challenge is against allegedly inadequate regulations implementing a statute governing home care workers, RCW 74.39A.056(2). As noted by the majority, that statute provides that care workers with a founded finding of abuse shall not be employed in the care of vulnerable adults. She believes, as do I, that there should be an opportunity for abusers to demonstrate their rehabilitation and resume employment in their chosen

---

[1] Every case brought under .030(1) has involved suit brought against an employer. *Kilian v. Atkinson*, 147 Wn.2d 16, 50 P.3d 638 (2002) (independent contractor sued employer); *Pulcino v. Fed. Express Corp.*, 141 Wn.2d 629, 9 P.3d 787 (2000) (flight attendant sued airline); *Currier v. Northland Servs., Inc.*, 182 Wn. App. 733, 332 P.3d 1006 (2014) (independent contractor sued employer); *Buhr v. Stewart Title of Spokane, LLC*, 176 Wn. App. 28, 308 P.3d 712 (2013) (plaintiff sued former employer); *Calhoun v. State*, 146 Wn. App. 877, 193 P.3d 188 (2008) (detainee working in commitment center sued center); *Isaacson v. City of Centralia*, noted at 125 Wn. App. 1045 (2005) (unpublished) (employee sued city); *Pittman v. King's Command Foods, Inc.*, noted at 118 Wn. App. 1030 (2003) (unpublished) (employees sued employer); *Zollinger v. The Boeing Co.*, noted at 109 Wn. App. 1045 (2001) (unpublished) (factory worker sued Boeing); *Sedlacek v. Hillis*, 104 Wn. App. 1, 3 P.3d 767 (2000), *aff'd in part, rev'd in part*, 145 Wn.2d 379, 36 P.3d 1014 (2001) (estate of apartment complex manager sued employer); *Dedman v. Wash. Pers. Appeals Bd.*, 98 Wn. App. 471, 989 P.2d 1214 (1999) (prison guard sued prison); *Hoddevik v. Arctic Alaska Fisheries Corp.*, 94 Wn. App. 268, 970 P.2d 828 (1999) (fishing boat crew member sued employer).

3

field.[2]  However, she can demonstrate no authority requiring that DSHS act to mitigate the harshness resulting from this statute.  But, even if the department has the authority to act in that manner, the policy choice of how to exercise that authority is one left to DSHS.

Instead, Ms. Howell tries to compel DSHS to act in her favor by arguing that the lack of a policy results in unequal treatment.  Disparate impact analysis, borrowed from Title VII of the Civil Rights Act of 1964,[3] simply is not applicable to this situation.  *Marquis* has already noted that Title VII is not helpful in actions brought under .030(1).[4] 130 Wn.2d at 109-11.  This is not a practice by some employer that discriminates against a job applicant.  It is an across-the-board regulatory statute designed to ensure that our vulnerable communities are protected from all known abusers.

In this situation, our case law is clear that a showing of discriminatory purpose or intent is required; disparate impact is insufficient.  *State v. Coria*, 120 Wn.2d 156, 174-75, 839 P.2d 890 (1992) (impact of sentencing enhancement on minorities); *State v.*

---

[2] I have previously complained about the harsh outcomes abuse findings have on care workers. *Crosswhite v. DSHS*, 197 Wn. App. 539, 574 n.12, 389 P.3d 731 (2017) (Korsmo, J., dissenting).  This case was more properly brought as a due process challenge. *See Fields v. Dep't of Early Learning*, No. 95024-5 (Wash. Feb. 21, 2019) https://www.courts.wa.gov/opinions/pdf/950245.pdf.

[3] *See* 42 USC 2000e-2(k).

[4] Although Washington has used disparate impact against employers under WLAD, the fact that Washington (1) typically finds Title VII unhelpful and (2) already identified which nonemployers it reaches suggests that it should not be applied against third party regulatory agencies.

*Johnson*, 194 Wn. App. 304, 308, 374 P.3d 1206 (2016) (disparate impact of court fees); *State v. Clark*, 76 Wn. App. 150, 156-57, 883 P.2d 333 (1994) (disparate impact resulting from ineligibility for sentencing alternative). Ms. Howell provides no evidence of discriminatory purpose behind the known abuser statute. The alleged disparate impact of that statute is simply not actionable under WLAD.

Another reason this action fails is because WLAD is not some sort of super-statute designed to trump competing statutes. Typically, we construe statutes to avoid conflict in order to give effect to both, but a later adopted statute will govern when the two conflict. *Bailey v. State*, 147 Wn. App. 251, 262-63, 191 P.3d 1285 (2008). Here, there is a statute prohibiting discrimination in employment and a later adopted statute prohibiting known abusers from working with vulnerable populations. We can give effect to both statutes by limiting them to their core concerns—discrimination in employment and protection of the vulnerable. Known abusers are not a protected class under WLAD and the statute need not be construed to extend to them. But, even if it were unclear, the specific policy of the latter adopted statute, RCW 74.39A.056(2), should govern.

The consequences of applying WLAD in this manner are significant. All sorts of otherwise neutral statutes could be subject to oversight. Our prison population is overwhelming male and includes a large number of minorities; do those facts render the criminal law invalid under WLAD? Are school admissions policies that have disparate

impact on some groups invalid? And, even if invalid under WLAD, why should the policy of that statute govern over the policy of another statute? The legislature has not granted higher status to some statutes over others. We should not do so either.

Accordingly, I dissent for the following reasons: (1) this was not an employment action and DSHS was not acting as an employer, making RCW 49.60.030(1)(a) inapplicable; (2) there is no obligation on DSHS to ameliorate the known abuser statute; (3) disparate impact analysis has no role in this litigation; (4) appellant has not shown that the known abuser statute was adopted for a discriminatory purpose; and (5) WLAD has no super status authorizing it to trump the policies of later adopted statutes. If there is a policy problem with the known abuser statute, it should be tested and resolved under constitutional principles rather than under an inapplicable statute.

The summary judgment ruling should be affirmed.

_____
Korsmo, J.

6